UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at ASHLAND

CIVIL ACTION NO. 13-48-HRW

DAVID PARKER,                                                                  PLAINTIFF,

v.                 **MEMORANDUM OPINION AND ORDER**

GREENUP COUNTY BOARD OF EDUCATION, *et al.*,       DEFENDANTS.

This matter is before the Court upon the Defendants' Motion for Summary Judgment [Docket No. 16]. The motion has been fully briefed [Docket Nos. 16-1, 28 and 30]. For the reasons set forth herein, the Court finds that summary judgment is not warranted.

**I.     BACKGROUND**

In November 2007 Plaintiff David Parker, an African-American, was hired as a full-time custodian, a classified position within the Greenup County Public Schools. His supervisor, Jack McCleese, Director of Grounds, Maintenance, and Custodian, assigned him to work at the Greenup County High School. McCleese acknowledged that he hired Parker despite his criminal record, consisting of convictions for receiving stolen property and multiple DUIs, because it seemed Parker sincerely wanted to change. He found him to be sincere in that desire. [Docket No. 16-2].

Based upon the record, Parker's his work was generally satisfactory during the period for November, 2007 through April of 2008.

Sometime in the Spring of 2008, Parker advised McCleese that he would be absent from work for approximately thirty days to serve a jail sentence for DUI. Parker was concerned

about being able to keep his job, but McCleese told Parker that he could use vacation and sick days and gave Parker his word that he wouldn't have to worry about his job. [Docket No. 17, Deposition of David Parker, pp. 47-51]. McCleese recalls that he advised Parker that he had sufficient sick, personal and vacation days to cover a thirty-day incarceration if the time was served prior to the end of the school year on June 30, 2009. [Docket No. 18, Deposition of Jack McCleese, pp. 24-25]. Based upon these discussions, Parker did not formally request time off. McCleese himself acknowledged that Parker had told him, "If I'm not here after June 30, you know where I'll be." [Docket No. 16-3].

For reasons that are not clear based upon the record before this Court, Parker's final hearing and sentencing was delayed until the end of June 2008. Parker served his thirty day sentence in July 2008.

Parker was terminated by memorandum dated July 10, 2008, for "neglect of duty" because he had "not returned to work nor have you notified your supervisor." [Docket No. 16-6]. Parker filed a grievance contesting his termination and alleging that the termination was racially motivated. [Docket No. 16-7]. Plaintiff wrote on page two of his Grievance what lead to his suspicion that his termination was "racially motivated":

> All this was set up with Mr. McCleese and myself for June 11th, but [the] Judge was not there, so I had to return on June 30th. So he knew that on the 30th I would be incarcerated. I made a lot of decisions concerning my court case, and financial matters based on Mr. McCleese's word. So that's why I wasn't at work from July 1st to July 8th. Also, he was informed by Ms. Trina Abrams (teacher) and Ms. Sheryl Lyles (GC custodian) knew about the arrangement. "However, Looking back over the situation, I have to ask myself if my termination was more racially motivated than not notifying my supervisor or 'Neglect of Duty.['] Because that is totally not true. My supervisor had been informed before and after July 1st to July 8th . I was the first black custodian in the history of Greenup County, and felt that I performed my duties proficiently."

2

*Id.*

An investigation into the termination revealed no evidence of any racial motivation for Parker's termination. However, the investigation did reveal that termination notice did not meet the due process procedures set-forth in Board Policy 3.27 and Board Procedures 3.21 Ap.1 and Ap.21 in that the notice did not include a statement of the right to meet with the superintendent to discuss the charges against him, and a form, the signing and filing of which constitutes a demand for the meeting and denial of the charges. Accordingly, it was recommended that termination be reassessed based solely on the procedural shortcomings of his termination notice. [Docket No. 16-7].

Superintendent Randy Hughes did not specifically remember the recommendation in the report that the termination be rescinded, but he did recall McCLeese coming to him and asking him to reconsider the termination. [Deposition of Randy Hughes, pp. 18-19]. Hughes stated that he issued his September 12, 2008 letter reinstating Parker based upon McCleese's request. *Id.*

McCleese remembered events differently, testifying that he knew that a grievance was filed and investigated, but he recalled being asked by Superintendent Hughes if he had any objection to Parker being reinstated and telling him that he had no problem with Parker coming back to work. (McCleese Depo., pp. 39-41).

Parker was reinstated to full time employment.

On April 14, 2009 McCleese completed a written evaluation of Parker's job performance for the school year 2008-2009.[Docket No. 16-9]. That evaluation indicated that Parker needed improvement with respect to punctuality; in completing tasks accurately;

completing tasks in a timely manner; in using proper safety measures when working; with regard to his attendance record; and with regard to returning from breaks punctually. It further indicated that his performance was unsatisfactory with respect to reporting to work punctually. Finally, with respect to overall job performance, the evaluation had both the box for "satisfactory" and "needs improvement" marked. Parker was recommended by McCleese for continued employment and was rehired for the 2009-2010 school year. (McCleese Depo., p. 44).

Parker testified that at the beginning of this school year, he was subject to harsh treatment based upon his race, on multiple occasions, the use of the word "nigger" in his presence by a white co-worker. (Parker Depo., pp.94-96). Also Plaintiff's janitorial work cart was overturned and vandalized and left in the girls' locker room shower area. Plaintiff had been complaining about things being missing from his work cart. So he had begun storing it in a locked closet in the girls' locker room. (Parker Depo., pp. 120-122). Around this time, Parker found "key scratches" on both of the cars he drove to work, and his Ford Escort "had N-I-G-G-E-R on my hood, somebody had scratched that on there." (Parker Depo., pp. 125-126, 126:20-21).

He spoke to school principal, then Mr. Dunaway, about the scratches on his car. (Parker Depo. , pp. 126:11-12). Assistant Principal Amanda Powell recalled Plaintiff's complaints about fellow custodians bothering his things: "someone had taken his cart,… and it seems like maybe something happened to his car, maybe somebody wrote something on it." [Docket No. 25, Deposition of Amanda Powell, pp. 12-14]. She recalled discussion among the school administrators that it "needed to be reported to Mr. McCleese and Mr. McCleese would then

4

need to meet with the custodians and see what was going on. They were playing pranks on one another." *Id.* at 13-14. However, no such meeting was convened by McCleese.

Around this time, McCleese first claimed to be having problems with Parker's job performance. He testified regarding "an occasion [had] arisen over watching television." (McCleese Depo., p. 54). There is a dispute amongst the parties as to whether there were actual complaints or charges in this regard.

Sometime in the fall of 2009 McCleese instituted a new "team cleaning" program whereby custodians were assigned to work in two person teams and were assigned to begin work in certain specific areas and to proceed to clean in a specific rotation. (McCleese Depo., p. 55; Parker Depo., pp. 115).

According to McCleese, he had concerns that the team cleaning was not being implemented. Therefore, on January 20, 2010 he issued a written directive in this regard. The downstairs team, which included Parker, was given a written directive, which specified where the team would start cleaning, and the process for completion of their duties, together, in the order specified, until complete. [Docket No. 16-10].

On the same date, McCleese issued a written directive as to the time for beginning work, taking lunch breaks, and taking scheduled work breaks for all custodians. [Docket No. 16-11]. That directive provided that "[i]t is imperative that all custodians follow this schedule to accommodate the team cleaning concept. It is not to be deviated from without prior approval from your immediate supervisor". *Id.*

Shortly thereafter, McCleese addressed concerns regarding Parker to Superintendent Hughes in a written memorandum dated February 2, 2010. [Docket No. 16-12]. In the memo,

he noted the past year's tardiness concerns and that time records verified that on some occasions during the current school year Parker had also been tardy. *Id.*. He also described the team cleaning concept that had been instituted and then specified that on December 10, 16 and January 15 and 19, Parker had been observed in violation of the team cleaning concept. *Id*. The memo referenced the January 20 written directive and then noted that on January 27 Parker was observed to have taken his meal break at a time other than specified and that he was observed watching television going back and forth from the television to the tech room from 7:13 p.m. to 8:38 p.m., at which time he sat down in front of the television and ate his evening meal. *Id.*.

On February 10, McCleese sent a letter of admonishment to Parker, advising that he had failed to follow the team cleaning directive on December 10 and 16 and on January 15, 19, 27, 28 and February 3. [Docket No. 16-13]. Parker was advised that he needed to "immediately begin following the assigned schedule and eliminate his tardiness. Failure to do so would result in disciplinary action up to and including dismissal". *Id.*

As a result of the oral complaint to him and the corrective action memo of McCleese to Parker, Superintendent Hughes issued a letter to Parker dated February 19, 2010, advising him that McCleese had presented charges against him related to his work performance and setting a hearing in that regard for February 24, 2010. [Docket No. 16-14].

At the hearing, Parker pointed out that despite the fact that other employees had ignored the team cleaning directives and regularly left work prior to the end of their shift, no other employees received a letter from Hughes. Parker suggested possible racial undertones behind the stricter scrutiny of his work and referenced McCleese's racist jokes about President

Obama, jokes which McCleese admitted to having made. [Docket No. 10, Deposition of Randy Hughes].

Ten days after the hearing, on March 4, 2010, Parker initiated a complaint with the EEOC alleging racial discrimination. [Docket No. 16-18].

Thereafter, on March 12, 2010, Superintendent Hughes issued a written report pertaining to McCleese's charges against Parker [Docket No. 16-16]. In that report, Hughes indicated that he would not consider charges of misconduct relevant to incidents before January 20 because no written work directives had been issued prior to that date. *Id.*. Hughes stated that Parker had admitted deviating from the work schedule on January 27, 28 and February 3 and that the claim of failure to follow directions was sustained. *Id.*. Hughes found that Parker had been late to work three times and had once clocked out early.

Notably, with regard to the charge of recurring tardiness, on one of the days in question,, January 28, 2010, Hughes found Parker to have been tardy by two minutes, which is less than the three minutes McCleese identified as a fair grace period. (McCleese Depo., p. 57). Another date, January 27, Parker was tardy by four minutes, though he worked thirteen minutes late that shift, which made up the time. On the day that Hughes found Parker to have clocked out three minutes early, January 22, Parker had also arrived to work three minutes early. However, based upon the time cards produced in discovery, every custodian clocked out early that evening. Further, between January 4 and April 30, 2010, custodian Scott Scaff clocked out prior to the scheduled end of his shift far more often than not. Scaff did not receive any reprimand for those irregularities. From February 2 to April 30, 2010 Eva Logan, another,

custodian, clocked out early every single night, yet she was not reprimanded. Neither Scaff or Logan are African-American.

On April 15, 2010, McCleese completed his written evaluation of Parker's job performance for the 2009-2010 school year, in which he recommended non-renewal. [Docket No. 16-20]. Believing that some of its contents were inaccurate and unfair, Parker filed an Evaluation Appeal dated April 19, 2010, in which he expressed his belief that McCleese unfairly evaluated him "because he has been doing everything he can to get me fired because of racism." However, despite the standing policies, no steps were taken in response to the appeal.

In a memorandum dated April 21, 2010, two days after the disputed evaluation, Hughes wrote to Parker that his employment contract would not be renewed for the 2010-2011 school year.

As of the date of Plaintiff's non-renewal, of the twenty-four Custodians employed in the Greenup County Schools since August 1, 2009, Parker was the only one to have a non-renewed contract. He was also the only non-white custodian to work in the Greenup County Public Schools in that period, though he was not the only custodian who was tardy to work or who had ever deviated from the team cleaning concept.

The record is not clear as to when the non-renewal letter was delivered to Parker. He testified he believed that the letter was not delivered to him until after May 17, 2010, after he agreed to a mediation settlement regarding his first EEOC complaint in which he agreed to receive $3,078.40 back pay from the time he missed during his 2008 termination which was

rescinded. (Parker Depo.. pp. 186-187). Defendants believe that the termination letter was delivered earlier.

In August of 2010, Parker instigated another claim with the EEOC which charged the Defendant Board of Education of Greenup County with violating Parker's rights under Title VII of the Civil Rights Act of 1964. [Docket No. 16-23].

On July 25, 2011, the EEOC determined that "the evidence substantiates that the Charging Party [Parker] was discriminated against because of his race, Black, and retaliated against as alleged." Subsequently, on January 10, 2013, the Department of Justice issued a notice of Plaintiff's right to sue, from which this civil action followed.

In his Complaint, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) and the Kentucky Civil Rights Act, K.R.S. Chapter 344, Parker contends he was non-renewed as a result of the racially discriminatory animus of the Defendant, Jack McCleese and further, that Plaintiff was non-renewed upon Defendant McCleese's recommendation in retaliation for Plaintiff's prior complaint or complaints of race discrimination.

Defendants seek judgment as a matter of law as to all claims alleged herein.

## II. STANDARD OF REVIEW

Under Rule 56 (c) of the Federal Rules of Civil Procedure, a court may grant summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56©. In considering summary judgment, the court must construe the facts and draw all inferences therefrom in the light most favorable to the party opposing the motion-in this case, the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*., 477 U.S. 242, 248 (1986). The sufficiency of the evidence at summary judgment is guided by the "substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252. As the instant case is governed by the preponderance of the evidence standard, this court must ask itself "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* This does not mean that the evidence must dictate a verdict for plaintiff; rather, a genuine issue of material fact exists if there is sufficient evidence, beyond a "mere scintilla," that a jury *could* return a verdict for plaintiff. *Id.*

## III. ANALYSIS

### A. Discrimination Under Title VII and the Kentucky Civil Rights Act

Both the Kentucky Civil Rights Act, KRS § 344.040 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e makes unlawful an employer's decision "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin[.]" 42 U.S.C. § 2000e - 2(a)(1)(1994).

Construing the facts in a light most favorable to Plaintiff, he does not allege direct evidence of discrimination. In the absence of such evidence, Plaintiff may make a submissible case by presenting evidence from which one may infer invidious intent behind his termination. The process by which the sufficiency of such a case is tested was first articulated in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981).

In this paradigm, in order to survive summary judgment, the plaintiff must establish a *prima facie* case of discrimination. He may do so by introducing evidence sufficient to support a finding that (1) plaintiff was a member of the protected class, (2) plaintiff suffered an adverse employment action, (3) plaintiff was qualified for the position either lost or not gained and (4) plaintiff was treated less favorably than employees outside her protected class. *McDonnell Douglas*, 411 U.S. at 802. This proof "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254. Once this proof is presented the burden shifts to the employer that the adverse employment action was based upon legitimate, non-discriminatory reasons. The burden then returns to Plaintiff to prove that the proffered reasons are merely pretext for discrimination. *Id.*

Parker, without dispute, satisfies the first three elements. The fourth element is, however, hotly contested. It requires a showing that Plaintiff was treated differently than employees outside the protected class for the same or similar conduct. To be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).

11

Plaintiff argues that his coworkers were similarly situated in that they had essentially the same job descriptions, the same workplace, and the same supervisor. He testified that no similarly situated employee was non-renewed despite the fact that they, like Parker, had been tardy to work, left work early, disregarded the team cleaning concept, and were present for parts of basketball games during work shifts.

Defendants maintain that Plaintiffs testimony in this regard is not material because the other custodians were **not** similarly situated. They argue that Parker had a job history that included the 2008 failure to report to work while incarcerated for DUI, the 2008-2009 job evaluation which documented performance issues. Defendants contend that in order to establish that other similarly situated employees were treated differently than Parker with respect to non-renewal or discharge, Plaintiff would have to establish evidence that such employees had similar violation histories. Without this proof, Defendant assert that Plaintiff has failed to present a *prima facie* case of discrimination and, as such, summary judgment is due.

The determination of whether Parker's past violations or criminal history set him apart from other custodians or whether he was singled out for other reasons raises questions of fact and credibility, which are not properly answered upon summary judgment. Rather, it is the job of a jury. Indeed, courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, *see United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (acknowledging that discrimination cases present difficult issues for the

trier of fact, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes"), thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004)(citation omitted).

The he said-they said nature of the proof in this case continues in the additional analysis. Whereas Defendant maintain they had legitimate, non-discriminatory reasons for terminating Parker's employment, to-wit, the charges brought against him by McCleese in February of 2010, Plaintiff insists he was subjected to a double standard, based upon his race. For this Court to adjudicate these facts at this juncture of the litigation would be to rob the jury of its very purpose. As such, summary judgment is not warranted as to this claim.

### B. Title VII Retaliation Claim

Parker alleges that McCleese and the other Defendants engaged in retaliation prohibited under Title VII of the Civil Rights Act of 1964, 21 U.S.C. § 2000e to -17 (2006). The anti-retaliation provision of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of its employees ... because he has opposed any practice made an unlawful employment practice by this title [the "opposition clause"], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [the "participation clause"].

42 U.S.C. § 2000e-3 (a) (2006).

Therefore, to state a prima facie case under Title VII, Parker must demonstrate that 1) he engaged in protected activity, 2) Defendants knew of this exercise of his protected

13

rights, 3) Defendants thereafter took adverse employment action, and 4) there was a causal connection between the protected activity and the adverse employment action.

The Court is mindful that in the context of a retaliation claim, Parker "need not prove his *prima facie* case by a preponderance of the evidence at this stage. Indeed, the burden of establishing the prima facie retaliation case is easily met." *Singfield*, 389 F.3d at 563 (citation omitted); *See also, Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). All that is required of plaintiff at the prima facie stage is to demonstrate that he has a case, that the evidence is on his side. Once Parker has established a prima facie case of retaliation, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the action. *Singfield*, 389 F.3d at 563. "To satisfy this burden, [defendant] 'need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.' " *Id.* (*quoting Burdine*, 450 U.S. at 257). Upon such a showing, the burden shifts back to Parker to establish that the Defendants; proffered reason is mere pretext. *Id.*

In the instant matter, it is uncontested that Defendants took "adverse" employment action when it elected no to renew Parker's contract. Nor can it refuted that Parker engaged in "protected activity' when he sought relief from the EEOC in March 2010. The employer knew that Parker had filed an EEOC complaint, because Randy Hughes was contacted by an EEOC officer. (Hughes Depo., pp. 32-33). Defendants dispute, however, that there was a causal connection between the protected activity and the decision to terminate Parker's employment.

14

To establish the causation prong of the *prima facie* case, "plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *McNeail-Tunstall v. Marsh USA*, 307 F.Supp.2d 955 (W.D.Tenn.2004). In other words, the standard for establishing a prima facie case is merely whether there is sufficient evidence to give rise to an inference of causation, not whether plaintiff has conclusively proven her case, and plaintiff has satisfied this lesser burden.

Defendants also argue that Parker has failed to satisfy the *prima facie* element of causation because temporal proximity alone is insufficient to prove causation. While temporal proximity alone may indeed be insufficient to meet the burden of proof at trial, temporal proximity can give rise to an inference of causal causation sufficient to meet the lesser burden of establishing a *prima facie* case. *See Singfield* 389 F.3d at 563 (6th Cir.2004) ("[T]he temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a prima facie case.").

Sixth Circuit precedent is not crystal clear on this point. In *Nguyen v. City of Cleveland*, the Sixth Circuit reiterated that "temporal proximity in the absence of other evidence of causation is not sufficient to raise an inference of a causal link." *Nguyen*, 229 F.3d at 566. *Singfield*, published four years, suggests that temporal proximity alone is sufficient. *See Singfield*, 389 F.3d at 563 (citing cases in which temporal proximity served to prove causation and finding that temporal proximity was sufficient in the case at bar to

15

infer causation). Although the two cases seem to be directly contradictory, the *Nguyen* court did note that "evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation" *Nguyen*, 229 F.3d at 563, and observed that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference." *Id*. at 567. Seemingly *Singfield* presented the factual circumstances lacking in *Nguyen*.

In any event, even if the more rigorous *Nguyen* standard, under which the plaintiff must establish more than mere temporal proximity, is controlling, this court finds that, at a minimum, there is a factual issue as to the causal connection between the March 2010 EEOC charge and the non-renewal in April.

If no such factual issues existed, assuming a *prima facie*, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the termination. As discussed *supra*, the records show that Parker consistently failed to adhere to directions and rules and particularly objected to following McCleese's team cleaning concept directives even after that concept was memorialized by a written directive in January of 2010. Defendants have satisfied its burden of producing 'admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. " *Burdine*, 450 U.S. at 257).

Finally, the burden shifts back to Parker to demonstrate that the proffered legitimate, non-discriminatory reason is mere pretext to cover up the true, prohibited reason for the termination. Again, it is not for this Court to attempt to divine Defendants' motivation.

## IV. CONCLUSION

The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23(1986). In this case, Defendants have not demonstrated that there remain no genuine issues for trial. To the contrary, factual issues abound. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. As such, Defendants are not entitled, at this juncture, to judgment. This is not to suggest that a jury will more likely believe Plaintiff over the Defendants. Rather, under the standards of Fed.R.Civ.Proc 56, summary judgment is not appropriate.

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 16] be **OVERRULED**.

This 2nd day of July, 2014.



Signed By:
Henry R. Wilhoit, Jr.
United States District Judge